**Emma Pearl GRIST, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–17804.**

Court of Criminal Appeals of Oklahoma.

May 21, 1973.

Rehearing Denied June 18, 1973.

O. A. Cargill, Jr., Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Michael Cauthron, Asst. Atty. Gen., Kenneth L. Delashaw, Jr., Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Emma Pearl Grist, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Oklahoma County, Case No. CRF–71–1908, for the offense of Murder. Her punishment was fixed at life imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Captain Chester Longacre of the Bethany Police Department testified that at approximately 10:45 p. m. on August 6, 1971 he received a call concerning a shooting at 5007 North Mueller. He proceeded directly to the address and, upon arriving, observed a little girl standing on the front porch. She was yelling, " 'Sissy has been shot, Sissy has been shot.' " (Tr. 20) He entered the house and observed another little girl lying on the bed with the defendant lying on top of her. Upon noticing the blood on the little girl's head, he asked the defendant, "What happened?". The defendant said either "me" or "he". The officer sand, "He who?" whereupon the defendant stated, "Not he, me. I shot her." The defendant asked him how bad he thought the little girl was hurt and he responded that he "didn't think she would make it." (Tr. 32) He observed a revolv-

er lying on the floor just inside the door of the bedroom.

Captain B. J. Schmidt of the Bethany Police Department testified that he arrived at the scene at approximately 11:05 p. m. He observed a considerable amount of blood on the bed, a brown leather holster lying on the floor and a .22-caliber pistol also lying on the floor. He recovered four projectiles which, together with the pistol, were submitted to the State Bureau of Investigation for ballistics tests. He subsequently obtained a bullet taken from the head of the deceased after the autopsy which was submitted for analysis with the other physical evidence.

Ray Lambert, firearms examiner for the Oklahoma State Bureau of Investigation, testified that in his opinion State's Exhibit No. 10, the bullet removed from the victim's head, had been fired from State's Exhibit No. 9, the revolver Officer Schmidt recovered from the floor of the bedroom.

Susan Jayne Ramsey testified that she was employed as a telephone operator on duty on the evening in question. At approximately 10:40 p. m., she received a call from a woman who requested her to call the police and send them to 5007 North Mueller. The voice of the woman making the call seemed calm.

The defendant's husband, Wayne Grist, testified that on the evening in question he was working as an electronics technician at Baptist Hospital. He went home to eat at 7:00 and returned to the hospital at approximately 8:00. After returning to work, he talked to his wife by telephone approximately three or four times. He was unable to recall the text of the conversations other than the final two. He testified that his wife said something "about 'I hear something,' or 'Listen to this', or something; and there was a large noise." (Tr. 111) He immediately called back home and his wife was screaming, "Help me. Help me." (Tr. 113) Grist was declared to be a hostile witness. He admitted it was possible that he made a statement to Captain Schmidt to the effect: "I stated to her, 'Alright, God-

damned it, if you don't like it, pack your clothes and get out,' and she said, 'Alright, I can't stand it any longer,' and then there was a pause, and then [he] stated that she stated to [him], 'Alright, listen to this,' and then [he] said [he] heard what [he] thought were two shots." (Tr. 112–113)

On cross-examination, he testified that his wife started acting out of character or abnormal since the death of her father three or four years ago. She thought that her father had been murdered by arsenic poison administered by her mother. She started talking about her brother stealing cattle and that her sister became a prostitute. She remained in the psychiatric ward of Baptist Hospital for approximately sixty-six days after the incident.

On re-direct examination, he testified that on a prior occasion she threatened to kill him and the children with a gun.

Dr. Charles Marshall, pathology consultant with the State Medical Examiner's office, testified that he performed an autopsy on Denise Grist on August 8, 1971. In his opinion, the cause of death was a single gunshot wound from a small caliber weapon which entered the right temple. He removed the bullet from the skull of the child and gave it to Captain Schmidt.

Beulah Stevens, Mary Jean Walraven, Helen Hawks and Linda Edlin testified that they were friends or neighbors of the defendant. They described the defendant as a very loving, devoted mother to the children. They each testified that the defendant's demeanor and character changed following the death of her father.

Ruby Barnes, the defendant's mother, testified that her father died in December of 1968. She testified that she did not kill her husband, that her son had not stolen cattle and that her daughters were not prostitutes.

Dr. Leonard Diehl testified that he was the defendant's personal family doctor. He considered the defendant an excellent parent and that she took better than average care of her children.

Dr. Sam Collins testified that he was a staff psychiatrist at Baptist Hospital. He first observed the defendant the morning of August 7 in the psychiatric ward at Baptist Hospital. The defendant had a gunshot wound in the head. He continued to observe and treat her during her stay at the hospital. He testified that in his opinion the defendant was schizophrenic and completely withdrawn from reality. The defendant had no recollection of the events prior to her coming into the hospital and he felt that at the moment of the incident, defendant was insane and did not know right from wrong. In his opinion, the defendant still needed help and treatment. He testified that defendant's schizophrenia could have suddenly manifested itself on the day of the killing as a result of the strain of her father's death and other family problems.

On recross-examination, he testified that he could not give a logical explanation for her statement that, "I shot her" when she did not know that she had shot her daughter.

Dr. Nolan Armstrong, a psychiatrist, testified he examined the defendant and in his opinion she was under the influence of a major emotional disturbance and a schizophrenic process. In his opinion, she was psychotic at the time of the shooting and was completely unaware of what she was doing.

In rebuttal, Frank Brady, an agent with the Oklahoma State Bureau of Investigation, testified that he investigated the death of defendant's father in December of 1968. He took statements from four of the children of the deceased including the defendant. Each of the statements were consistent with each other to the effect that they each thought that their mother had poisoned their father.

Gayle McCook testified that she was an inmate of the County Jail being held on a forgery charge. She was a cellmate with the defendant and had been since March 15, 1971. She heard the defendant state, "if she got out of this, next time she would do it for good" but "I don't have it figured out yet." (Tr. 236–237)

Dr. Loraine Schmidt, a psychiatrist with Central State Hospital in Norman, testified that the defendant was admitted to the state hospital for observation on October 12, 1971 and discharged on December 9, 1971. She did not feel there was any evidence of psychosis during the time the defendant was at the hospital. In her opinion, the defendant was able to distinguish between right from wrong and able to advise and help her attorney in her defense. She testified that she was not able to determine the defendant's state of mind at the time of the incident because the defendant refused to discuss the death of her daughter. She testified that she found no evidence of the defendant being schizophrenic and, in her opinion, the defendant did not require hospitalization for treatment.

The first proposition asserts that the trial court erred in not instructing the jury on Manslaughter in the First Degree. The record reflects that the Assistant District Attorney requested that the court give a manslaughter instruction wherein the following transpired:

"BY THE COURT: Does the Defendant want an included offense Instruction?

"BY MR. CARGILL: No, your Honor.

"BY THE COURT: The Court fully understands that it is the burden of the Court to instruct on included offense in a case of this kind whether requested or not.

"BY MR. BOX: Yes, sir.

"BY THE COURT: I don't believe the manslaughter statute applies. That will be overruled and exceptions allowed. Any other requested Instructions from either side?

"BY MR. CARGILL: No, your Honor." (Tr. 264)

In Myers v. State, Okl.Cr., 480 P.2d 950, this Court stated:

"Had the jury believed the defendant's theory of the case, they would have determined it to be justifiable homicide and acquitted the defendant. In the case at bar, there were no elements of manslaughter, it was murder or nothing. Evidently defense counsel wanted it presented to the jury as it was, because they offered no objection to the instructions given nor did they offer any written instructions. This Court does not condone actions of defense counsel in 'laying [sic] behind a log', not objecting or offering any instructions and the raising it for the first time on appeal."

Although this proposition is improperly before this Court, we are of the opinion that the trial court properly refused to give the First Degree Manslaughter Instruction. In Dukes v. State, Okl.Cr., 499 P.2d 471, we stated:

"In his reply brief, defendant asserts as proposition one: 'Notwithstanding the arguments offered by the State, the plaintiff in error's mental condition was sufficient to reduce the charge to First Degree Manslaughter.' Defendant cites no pertinent authority in support of this proposition and we are unable, after exhaustive research, to find authority in support of this assertion.

"On the contrary, we find in Foster v. State, 37 Ariz. 281, 294 P. 268 (1930), the following language:

'We can see no reason for submitting the issue of second degree murder or manslaughter to the jury when the evidence conclusively shows defendant guilty of the highest degree of the crime or not guilty at all by reason of his insanity. There is no middle ground in such case, no evidence tending to show the lower degree of murder or manslaughter.'

"The language used by the Arizona Court was adopted in this State in Dare v. State, Okl.Cr., 378 P.2d 339 (1963), page 349.

"In the case at bar, defendant admitted the homicide, and chose as his theory of defense 'temporary insanity.' It would not have been error for the court to have refused an instruction upon manslaughter in the first degree. Defendant may not be heard to complain by reason of the court's failure to reduce the charge to first degree manslaughter."

■ The second proposition contends that the prosecuting attorney made inflammatory remarks. The first alleged improper remark occurred during direct examination of Wayne Grist as follows:

"[By Mr. Box] Q. Did you ever tell me that you were going to anything you could to get your wife off?

"BY MR. CARGILL: Just a moment, please. Now that is—come here, counsellor. (At the bench) Now your Honor, the Defendant moves for a mistrial because of the statement of Mr. Irven Box that he asked a highly prejudicial question and statement to this witness. 'Did you ever tell me that you were going to do anything in the world to get your wife off?' We think it justifies a mistrial in this case. It is highly irregular and prejudicial.

"BY THE COURT: Motion for mistrial will be overruled. The objection to the question will be sustained. The jury is admonished to do your best to forget the question and any indicated response, if any." (Tr. 109)

The record further reflects that the witness did not answer the question nor did the defendant request the court to further admonish the jury. In dealing with a similar proposition in Dorsey v. State, Okl.Cr., 487 P.2d 996, we stated:

"* * * It is readily apparent that the question was not answered, and no evidence was presented to the jury. Defense counsel informed the jury that he would withdraw the Motion for Mistrial if the jury were admonished not to consider it in any way. The court, thereafter, sustained the objection to the ques-

tion. The defendant did not object to the form of the admonishment, nor did he request that the court further admonish the jury.

"The trial court properly sustained the objection, and admonished the jury not to consider it. The defendant was apparently satisfied with the court's ruling at the time of trial, and, absent a showing of prejudice, should not be allowed to complain at this late date."

We have previously held that an admonition to the jury not to consider the remarks of counsel usually cures an error unless it is of such a nature as, after considering the evidence, appears to have determined the verdict. See Kolke v. State, Okl.Cr., 493 P.2d 854.

■ Defendant further complains of a statement made by the prosecuting attorney in his closing argument as follows:

"BY MR. LANNING: I would like to start at least in this case in the argument as to what is certain in this case. There is a lot of questioning about what is certain in this case; and that is that on August the sixth, 1971, at 5007 North Mueller in Bethany a young six year old, Denise Grist, while sleeping in her bed was murdered by this Defendant. That evidence has been unrefuted and unrebutted. * * *" (Tr. 269)

The record does not reflect that the defendant objected to the statement of the prosecuting attorney. In Igo v. State, Okl. Cr., 267 P.2d 1082, we stated in the ninth paragraph of the Syllabus:

"A prosecuting attorney has the right to discuss the evidence as he understands it, and from the standpoint of the defendant's guilt; and an erroneous statement of the evidence, if not conceived in a spirit of unfairness or fraud, will not be ground for reversal. He may state his opinion as to the defendant's guilt when he also states that this opinion is based upon the evidence in the case."

We have previously held that counsel for defendant must not only object to improper statements of the county attorney in his argument to the jury, but he must go further and move the court to exclude such remarks from the jury and instruct them not to consider them for any purpose, unless the remarks were of such a character that error would not be cured by the withdrawal of the remarks. Harvell v. State, Okl.Cr., 395 P.2d 331. We, therefore, find this proposition to be without merit.

■ The third proposition asserts that the trial court erred in permitting Officer Longacre to testify as to certain statements made by the defendant without having first advised her of her constitutional rights. We are of the opinion that the statements were properly admissible. Officer Longacre received a report of a shooting, proceeded to the scene and observed a little girl lying on the bed with the defendant lying on top of her. He asked, "What happened?" or "Who shot the baby?" and the defendant responded that she had shot her. It is readily apparent that the statement elicited was not the product of custodial interrogation nor had the investigation focused on the defendant. In Drake v. State, Okl.Cr., 437 P.2d 461, we stated:

"The facts of our instant case clearly show that the police officers walked into the house which was the scene of the crime and made a general inquiry as to what had happened. The defendant spoke up, and said she had shot her husband. Under neither Escobedo nor Miranda [1] was defendant's statement inadmissible. * * *"

■ The final proposition contends that the trial court erred in overruling defendant's two motions for a directed verdict of acquittal. Defendant argues that the trial court should have sustained the motions in that she made proof by two qualified witnesses that she was legally insane at the

---

1. Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

time of the commission of the offense and that the State thereafter made no proof whatever that the defendant was sane on August 6, 1971. We are of the opinion that the trial court properly submitted the question of defendant's sanity to the jury. In dealing with a similar proposition in Jones v. State, Okl.Cr., 479 P.2d 591, we stated:

"The single assignment of error urged on appeal is that the evidence is insufficient to support the verdict of the jury for the reason that the testimony of the defense witnesses relating to the mental condition of the defendant, was unrefuted by the State. Great reliance is placed by counsel for defense, upon the testimony of Dr. Shadid whose opinion was, in substance, that the defendant was unable to distinguish right from wrong at the time of the commission of the offense.

"While the facts differ from the instant case, we believe that the principal of law determinative of this issue was expressed in Dare v. State, Okl.Cr., 378 P.2d 339, where, in the body of the opinion, we stated:

'It is next urged that the evidence was insufficient to support the verdict of the jury and in support of this contention, the defendant argues that when the testimony of Doctors Charles Smith and Jim Behrman [footnote omitted] (psychiatrist on the staff of Griffin Memorial Hospital, Norman) was introduced on behalf of defendant a reasonable doubt as to the sanity of the accused was raised and it became incumbent for the state to introduce expert testimony establishing the defendant's sanity beyond a reasonable doubt.

'This assertion presumes that the jury was bound to give credence to the opinions of Doctors Smith and Behrman. This presumption is not the law of this jurisdiction, for we have held:

(1) "The testimony of experts is not conclusive on the issue of mental capacity since the law makes no distinction in weighing evidence between expert testimony and evidence of other

character" (In re Smith, Okl.Cr., 326 P.2d 835);

and

(2) "On murder prosecution, the question of insanity at the time of the commission of the crime, presents a question of fact for the sole determination of the jury, and where there is any evidence tending to support the finding it is not the province of the appellate court to weigh the same." (Tarter v. State, Okl.Cr., 359 P.2d 596).'

"It is readily apparent that the testimony of defense witnesses did not raise a reasonable doubt in the minds of the jurors in that they concluded that the testimony of Dr. Shadid, based on observations made subsequent to the commission of the crime, may have established a Paranoid Schizophrenic condition at the time of the examination, but that his conclusion that the defendant did not know right from wrong at the time the homicide was committed, was not credible and should be disregarded.

"In the instant case there was evidence from which the jury could conclude that the defendant was normally sane, but had episodic remissions of insanity. In Cox v. Page, Okl.Cr., 431 P.2d 954, we stated, in referring to evidence of occasional insanity, that:

'Sanity being the normal and usual condition of mankind, the law presumes that every person is sane; the State in a criminal prosecution may rely upon such presumption without proof relative thereto.' "

We thus conclude that the trial court properly submitted the issue of insanity to the jury under the proper instructions. The judgment and sentence is affirmed.

BLISS, P. J., concurs.

BRETT, J., dissents.

BRETT, Judge (dissenting):

I respectfully dissent to this decision. Title 22 O.S.1971, § 1162, provides:

"When an indictment or information is called for trial, or upon conviction the

defendant is brought up for judgment, if a doubt arise as to the sanity of the defendant, the court must order a jury to be impaneled from the jurors summoned and returned for the term, or who may be summoned by direction of the court, to inquire into the fact."

The following section, § 1163, provides: "The trial of the cause or the pronouncing the judgment, as the case may be, must be suspended until the question of insanity is determined by the verdict of the jury."

Defendant offered the testimony of two reputable psychiatrists, both of whom testified that they believed defendant was insane at the time the offense occurred, and that she was insane at the time of trial. That testimony was not overcome by any evidence offered by the State, except for the testimony of the State Psychiatrist who testified she believed defendant was not psychotic. This testimony only created a doubt as to defendant's present condition of sanity. The transcript of testimony reveals, commencing at page 262, that defense counsel entered numerous motions, including that of defendant's condition of sanity. In ruling on the motions, the trial judge stated, in part:

"The question of sanity is one for the jury. Then in the event she were found not guilty by reason of insanity, whether or not she is dangerous is a jury question. Perhaps upon the jury's determination in that regard, the Court would or would not order her sent to a mental hospital. In other words, *if I were to direct a verdict at this juncture which frankly the court might be inclined to do, it would be based upon the State's failure, perhaps, to prove her sanity by competent evidence;* and in demurring to the evidence and asking for a directed verdict, the Defendant has not indicated in any way that the Court should find her insane. I think the question will have to be put finally to the jury, so your motion will be overruled and exceptions allowed." (Emphasis added.)

As I view this record, two questions were presented by the defendant's testimony: "Was defendant insane at the time the homicide occurred?" And secondly, "Was the defendant insane at the time of her trial?" The first question was properly presented to the trial jury by the court's instructions, but the second question was not properly resolved. The first question was presented in defendant's motion for new trial and is now presented in this appeal. Notwithstanding the jury's verdict, and as stated by the trial judge, the State presented no testimony to overcome the testimony of the two psychiatrists that defendant was insane at the time of the homicide.

The purpose of the statute, 22 O.S.1971, § 1163, is to assure that a convicted defendant —who might be insane at the time of trial— shall not be sentenced to the State Penitentiary until the question of present sanity is properly resolved. Notwithstanding the fact that defendant's motion for a jury determination of her present sanity was not specifically pressed by defense counsel, the motion was filed and it is contained in the record. I believe its merits were borne out by defense witnesses. Therefore, I believe the judgment and sentence should not have been imposed, until a jury determined the condition of defendant's sanity at the time she stood trial.

In Rice v. State, 80 Okl.Cr. 277, 158 P.2d 912 (1945), this Court provided in the second paragraph of the syllabus:

"When the question of insanity arises, it is the duty of the trial court to immediately suspend all proceedings and submit the issue of present insanity to a separate jury impaneled for that purpose only."

The Attorney General cites Jones v. State, Okl.Cr., 479 P.2d 591 (1971), in which this writer concurred, for the proposition that the jury was not bound to give credence to the opinions of the two psychiatrists who testified concerning defendant's condition of sanity. The instant case is readily distinguished from the Jones case

and also from the facts of Dare v. State, Okl.Cr., 378 P.2d 339 (1963), in that the question presented in both Jones and Dare concerned the single question of the defendant's sanity at the time the offense was committed. The instant case presented that question, and also presented the question of defendant's sanity at the time of trial.

This Court stated in Berwick v. State, 94 Okl.Cr. 5, 10, 229 P.2d 604, 609, (1951):

"[I]f the accused was insane at the time of the commission of the crime he would not be treated as having the capacity to commit the crime, and if he was also insane at the time of the trial he would not be treated as having the ability to make a rational defense and his trial, as we have seen from the authorities heretofore mentioned, would of necessity be deferred until said person was again rational. The issue is a fundamental one, where if a doubt arises as to the present sanity of the defendant the court must order a jury impaneled to inquire into the fact. Counsel for defendant could not waive this question. This court so held in Signs v. State, 35 Okl.Cr. 340, 250 P. 938, which holding has been approved in Johnson v. State, [73 Okl. Cr. 370, 121 P.2d 625]."

Therefore, I believe this conviction should be reversed and remanded for a jury determination of defendant's condition of sanity at the time of her trial; and in the event she is found to have been incompetent at that time, then the judgment and conviction should be vacated and set aside; and, when defendant regains her sanity, she should then be put to trial at a time when she is able to assist defense counsel in her defense.

However, insofar as the majority decision affirms this conviction, defense counsel is admonished to consider the United States Supreme Court's decision in David X. Fontaine v. United States, 411 U.S. 213, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973), wherein petitioner was granted an evidentiary hearing into the validity of his guilty plea, premised in part upon his contention of incompetency, when he entered his plea; and also Nolan v. United States, 466 F.2d 522 (10th Cir. 1972), wherein Plaintiff-Appellee was granted an evidentiary hearing concerning his alleged condition of incompetency, when he stood trial and was convicted by a jury.

Defendant should be granted post conviction relief under the provisions of 22 O.S.1971, § 1080 et. seq., and she should be ordered back for an evidentiary hearing into her condition of sanity at the time of trial, which would no doubt also consider her condition at present. Because defendant has already exhausted her funds, and this appeal was granted at State expense, I believe defendant is entitled to have court appointed counsel for her post conviction relief, and that the State should also pay for the services of the same two private psychiatrists who examined her and testified at her trial. Otherwise, the hearing will not present a full and complete determination into the issues to be presented.

Therefore, I respectfully dissent to the majority decision herein, for the foregoing stated reasons; and while I dissent, I urge further consideration of his defendant's conviction.